IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CHRISTOPHER JARBOE, *et al.*, on behalf of themselves and all others similarly situated, | |
|     *Plaintiffs,* | |
| v. | Civil Action No. ELH-12-572 |
| MARYLAND DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES (DPSCS), *et al.*, | |
|     *Defendants.* | |

**MEMORANDUM OPINION**

Five Maryland state prisoners who are profoundly deaf have brought this three-count putative class action against several Maryland state entities and officials, alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 *et seq.* (Count I); the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.* (Count II); and the right of free speech guaranteed by the First Amendment (made applicable to the states by the Fourteenth Amendment), pursuant to 42 U.S.C. § 1983 (Count III).[1]  Plaintiffs seek an award of damages, with prejudgment interest and attorneys' fees, as well as preliminary and permanent injunctive relief.  In particular, they seek to enjoin the defendants from violating plaintiffs' constitutional free speech rights and from "refusing to provide the proper interpretive services, [telecommunications devices for the deaf ('TDDs')], videophones and other hearing devices" that plaintiffs maintain are "required for deaf and hard of hearing inmates" in order "to fully participate in the programs offered by the

---

[1] This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

federally funded [state] prison system" and "to fully participate in and benefit from the programs offered by [defendant] public entities." Complaint at 37-38 (ECF 1).[2]

The named plaintiffs are Christopher Jarboe, Carroll Connelly, Vander Davis, Gary Denmark, and Garfield Redd. They seek to represent a class composed of "all deaf or hard of hearing inmates who currently are or will in the future be in the custody or supervision of" the Maryland Department of Public Safety and Correctional Services ("DPSCS" or the "Department"). Complaint ¶ 14.[3] Plaintiffs have sued six state entities and six individual defendants who are the principal officers for the six entities. The defendants consist of two groups: the "Correctional Defendants" and the "DLLR Defendants."

The Correctional Defendants consist of DPSCS, which is the Maryland state agency responsible for the operation of prisons and pre-release centers; the Department's Secretary, Gary D. Maynard; the Maryland Division of Corrections ("DOC"), which is the division of DPSCS responsible for operation of the state prison system; J. Michael Stouffer, the Commissioner of DOC; the Maryland Correctional Institute – Jessup ("MCI-J"), a medium-security correctional institute located in Jessup, Maryland, that plaintiffs allege houses most, but not all, deaf and hard-of-hearing DPSCS inmates; Dayena Corcoran, the Warden of MCI-J; Western Correctional Institution ("WCI"), a maximum-security correctional institution located in Cumberland, Maryland, that plaintiffs allege houses some deaf and hard-of-hearing DPSCS inmates, including those who rely on wheelchairs or other mobility devices; J. Philip Morgan,

---

[2] Although plaintiffs requested preliminary injunctive relief in the *ad damnum* clause of their Complaint, they did not file a separate motion for a preliminary injunction, nor have they submitted any evidence or argument to demonstrate their satisfaction of the standards for preliminary injunctive relief. *See Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Accordingly, I have not considered their request for injunctive relief.

[3] The issue of class certification has not yet been resolved.

the Warden of WCI; Maryland Correctional Enterprises ("MCE"), the division of DPSCS responsible for training and employing inmates who perform vocational services in business units in the state prison system; and Stephen M. Shiloh, the Chief Executive Officer of MCE. The "DLLR Defendants" are the Maryland Department of Labor, Licensing, and Regulation ("DLLR"), Division of Workforce Development and Adult Learning (Correctional Education) ("DWDAL"), which is the Maryland agency responsible for providing educational programs to DPSCS inmates; and Paulette Francois, the Assistant Secretary for DWDAL.   All of the individual defendants have been sued in their official capacities.   The wardens of MCI-J and WCI, Ms. Corcoran and Mr. Morgan, were also sued in their individual capacities.

Pending before the Court are two pre-discovery motions, one filed by the DLLR Defendants and the other by the Correctional Defendants (the "Motions").   *See* "DLLR Motion" (ECF 25); "Correctional Motion" (ECF 29).[4]   The Motions are styled as motions to dismiss; the DLLR Motion is also styled, in the alternative, as one for summary judgment.   Both Motions are supported by exhibits.   They have been fully briefed, and no hearing is necessary to resolve them.   *See* Local Rule 105.6.[5]   For the reasons that follow, I will deny both Motions.

## Background

As noted, plaintiffs' claims arise under the ADA, the Rehabilitation Act, and the First Amendment.   It is helpful to provide some background as to these provisions and the nature of plaintiffs' claims.

---

[4] MCE and its CEO, Mr. Shiloh, did not initially join in the filing of the Correctional Motion, but subsequently adopted it by reference, with plaintiffs' consent.  *See* ECF 31, 33, 36.

[5] Plaintiffs have separately opposed each Motion, and defendants have filed replies.  *See* "DLLR Opposition" (ECF 30); "Correctional Opposition" (ECF 38); "DLLR Reply" (ECF 37); "Correctional Reply" (ECF 43).

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(2). Title II of the ADA, which is at issue here, prohibits public entities, including "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government," *id.* § 12131(1), from discriminating "by reason of" disability against a "qualified individual with a disability." *Id.* § 12132.[6]

For purposes of Title II, a "qualified individual with a disability" is defined as an individual with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). State prisoners, such as plaintiffs, may qualify as "qualified individual[s] with . . . disabilit[ies]," *id.*, so as to come within the protection of Title II of the ADA. In *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 213 (1998), a unanimous Supreme Court held that "the plain text of Title II of the ADA unambiguously extends to state prison inmates."[7] Although the Fourth Circuit "has not squarely addressed the issue," several

---

[6] Title I of the ADA prohibits discrimination against individuals with disabilities in employment. *See id.* §§ 12111 *et seq.* Title III applies to public accommodations. *See id.* §§ 12181 *et seq.*

[7] In addition to prohibiting discrimination by the states on the basis of disability, the ADA contains a provision abrogating the states' sovereign immunity under the Eleventh Amendment. 42 U.S.C. § 12202. This provision is not valid under all circumstances. *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) (holding ADA's immunity-stripping

circuits "have determined that § 12132's words 'or be subjected to discrimination by that entity' are meant to be a 'catch-all phrase that prohibits all discrimination by a public entity, regardless of the context'"—in other words, that Title II of the ADA applies to "'anything a public entity does.'" *Seremeth v. Bd. of County Comm'rs of Frederick County*, 673 F.3d 333, 338 (4th Cir. 2012) (citing cases) (citations omitted); *see also Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 380-81 (D. Md. 2011) (collecting authority).

The Rehabilitation Act was enacted seventeen years prior to the ADA.  Title II of the ADA is closely related to § 504 of the Rehabilitation Act, and to "the extent possible, [courts] construe similar provisions in the two statutes consistently." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002).  *See Seremeth*, 673 F.3d at 336 n.1 ("Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is 'substantially the same.'") (citation omitted); *Rogers v. Dept. of Health & Environmental Control*, 174 F.3d 431, 433-34 (4th Cir. 1999) (stating that courts may apply Rehabilitation Act precedent in interpreting the ADA, and vice versa).  Indeed, the statutes "share the same definitions of disability," *id.* at 433, and Title II of the ADA explicitly provides that "[t]he remedies, procedures, and rights" provided under § 504 of the Rehabilitation Act "shall be the remedies, procedures, and rights [that Title II of the ADA] provides to any person

---

provision invalid with respect to Title I of the ADA).  But, it has been upheld in a number of circumstances with respect to Title II of the ADA, including in the context of state prisons.  *See United States v. Georgia*, 546 U.S. 151 (2006) (holding that Title II of ADA validly abrogates sovereign immunity as to conduct in state prisons that also violates the Constitution); *see also Tennessee v. Lane*, 541 U.S. 509 (2004) (holding that Title II of ADA validly abrogates sovereign immunity with respect to physical access to state courts by persons with disabilities); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005) (holding that Title II of ADA validly abrogates sovereign immunity of state institutions of higher education).  None of the defendants has asserted a sovereign immunity defense.

alleging discrimination on the basis of disability. . . .”  42 U.S.C. § 12133.[8]

Despite the general congruence of Title II of the ADA and § 504 of the Rehabilitation Act, there are two principal differences between the statutes.  First, a plaintiff must show a different “causative link between discrimination and adverse action” under the two statutes. *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 469 (4th Cir. 1999).  Under Title II, a plaintiff need only prove discrimination “by reason of” disability.  42 U.S.C. § 12132.  But, a successful Rehabilitation Act claim requires a showing of discrimination “*solely* by reason of” disability. 29 U.S.C. § 794(a) (emphasis added).  *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 n.17 (4th Cir. 2005) (“[W]e have recognized that the causation standards under Title II of the ADA and § 504 of the Rehabilitation Act are ‘significantly dissimilar.’”) (quoting *Baird*, 192 F.3d at 469).

The second significant difference between Title II and the Rehabilitation Act is that, as noted, Title II applies to any “public entity,” while § 504 of the Rehabilitation Act applies only to federal agencies or to “any program or activity receiving Federal financial assistance.”  29 U.S.C. § 794(a).  Thus, to show a violation of the Rehabilitation Act by a state, local, or private

---

[8] In turn, the Rehabilitation Act incorporates by reference the “remedies, procedures, and rights” established by Title VI of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000d *et seq.*), which prohibits discrimination on the basis of race, color, or national origin by recipients of federal financial assistance.   29 U.S.C. § 794a(a)(2).  Accordingly, courts look to Title VI precedent to resolve remedial and procedural issues arising in Rehabilitation Act and ADA Title II cases.  In general, a successful plaintiff in a suit under Title II of the ADA or § 504 of the Rehabilitation Act is entitled to a “full panoply” of legal and equitable remedies, including money damages and injunctive relief.  *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 830 (4th Cir. 1994); *see generally id.* at 829-32.  However, there are some limitations as to available relief.  Punitive damages are not available.  *See Barnes v. Gorman*, 536 U.S. 181, 189 (2002). Moreover, compensatory damages are available only upon proof of disparate treatment, rather than mere disparate impact.  *Pandazides*, 13 F.3d at 829-30 & n.9.

entity, a plaintiff must demonstrate that the "program or activity" at issue receives "Federal financial assistance."

"Program or activity" is defined in 29 U.S.C. § 794(b).  In relevant part, it includes:

[A]ll of the operations of—

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government . . .

any part of which is extended Federal financial assistance.[9]

The definition of "program or activity" in § 794(b) is expansive, but it has its limits. Under the plain meaning of the statutory language quoted above, receipt of federal funding by a state or state agency does not subject the entire state to Rehabilitation Act liability.  Rather, the liability of state entities under the Rehabilitation Act exists at the department or agency level.  If "any part" of "a department, agency, . . . or other instrumentality of a State" receives federal financial assistance, the entire agency is subject to the Rehabilitation Act.  *Id.*  If federal financial assistance is received at the state level, Rehabilitation Act liability extends to the state agency that distributes the funding and any state agency (or part thereof) that receives it.  *See id.*

---

[9] The definition of "program or activity" in 29 U.S.C. § 794(b) was enacted by Congress in the Civil Rights Restoration Act of 1987.  It was intended to overrule legislatively the Supreme Court's decisions in the companion cases of *Grove City College v. Bell*, 465 U.S. 555 (1984) (under Title IX, one of many civil rights statutes that, like the Rehabilitation Act, conditions liability on receipt of federal financial assistance), and *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624 (1984) (under the Rehabilitation Act), in which the Court had derived a more restrictive definition from the earlier statutory text.  In each case, the Court had held that, within a given institution, only specific, discrete programs that received federal funding were subject to the statute.  *See, e.g.*, *Haybarger v. Lawrence County Adult Probation & Parole*, 551 F.3d 193, 199-200 (3d Cir. 2008) (discussing enactment of Civil Rights Restoration Act of 1987); *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 287-88 (2d Cir. 2004) (same).

Moreover, courts have given a particular meaning to the term "Federal financial assistance" under the Rehabilitation Act and other federal statutes (such as Title VI of the Civil Rights Act of 1964) that condition liability on receipt of such assistance.  In *Venkatraman v. REI Systems, Inc.*, 417 F.3d 418 (4th Cir. 2005), the Fourth Circuit explained that "an entity receives 'assistance' [under Title VI] when it receives a subsidy, as opposed to compensation."  *Id.* at 421 (citing *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1209-11 (9th Cir. 1984), *cert. dismissed*, 471 U.S. 1062 (1985)).  In other words, "[o]nly if the government intends to provide a subsidy does Title VI [or the Rehabilitation Act] apply."  *Venkatraman*, 417 F.3d at 421.  The statutes do "not forbid discrimination by a government contractor, but instead forbid[ ] discrimination by entities receiving assistance."  *Id.*[10]

It is well established that private parties may sue to enforce Title II of the ADA and the Rehabilitation Act.  *Barnes v. Gorman*, 536 U.S. 181, 184-85 (2002); *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 828 (4th Cir. 1994); *Davis v. Southeastern Community Coll.*, 574 F.2d 1158, 1159 (4th Cir. 1978), *rev'd on other grounds*, 442 U.S. 397 (1979).  *Cf. Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582 (1983) (establishing that Title VI of the Civil Rights Act of 1964 supports a private right of action).  To prevail under an ADA Title II or Rehabilitation Act § 504 claim, "a plaintiff must show that [he or] she was excluded from participation in, or denied the benefits of, a program or service offered by a public entity, or subjected to discrimination by that entity."  *Constantine*, 411 F.3d at 499 (emphasis omitted).  To that end, the Fourth Circuit has recognized "three distinct grounds for relief: (1) intentional discrimination or disparate

---

[10] None of the defendant entities has disputed that it qualifies as a "program or activity" that receives "Federal financial assistance" within the meaning of the Rehabilitation Act.  29 U.S.C. § 794(a).

treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *Helping Hand*, 515 F.3d at 362.

The term "reasonable accommodations," which is derived from the employment discrimination provisions of Title I of the ADA, is essentially synonymous with the term "reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services," 42 U.S.C. § 12131(2), which is what Title II of the ADA requires a public entity to provide. *See, e.g.*, *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1195 n.8 (10th Cir. 2007) ("Title II's use of the term 'reasonable modifications' is essentially equivalent to Title I's use of the term 'reasonable accommodation.'"); *McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards.").

Under the rubric of "reasonable modifications," the statute defines "auxiliary aids or services" to include the following:

> (A) qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments;
>
> (B) qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments;
>
> (C) acquisition or modification of equipment or devices; and
>
> (D) other similar services and actions.

42 U.S.C. § 12103(1). The statutory definition is not exclusive, however. Pursuant to Congressional authorization, *see* 42 U.S.C. § 12134(a), the Justice Department has promulgated, by regulation, a more expansive listing of auxiliary aids and services. *See* 28 C.F.R. § 35.104.

In this suit, plaintiffs claim that defendants have violated Title II of the ADA and § 504

of the Rehabilitation Act by failing to provide meaningful access or reasonable accommodations to plaintiffs.   According to plaintiffs, the violations encompass discriminatory policies of defendants, as well as defendants' failure to make available necessary auxiliary aids and services that would accommodate plaintiffs' hearing disabilities and enable them to communicate effectively with both hearing and deaf or hard-of-hearing persons.   In particular, plaintiffs contend that, as a result of defendants' statutory violations, they "have been prevented from effectively communicating by telephones with family, friends, and attorneys outside of prison"; that they "have missed prison-wide safety announcements, prison counts and announcements for meals and other important daily activities"; that they "have been excluded from participation in educational and counseling programs offered by DPSCS and Correctional Education, including those required under the terms of their sentencing"; that they "have been discriminated against in work assignments"; that they "have been denied the ability to meaningfully participate and defend themselves in disciplinary hearings"; and that they "have been prevented from learning a trade, and receiving educational and industrial credits that could reduce their overall incarceration time."   Complaint ¶ 4.

In addition to the alleged statutory violations, plaintiffs maintain that defendants' conduct rises to the level of a deprivation of constitutional rights.   In particular, they claim that defendants have deprived them "of their freedom of speech, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by preventing Plaintiffs from communicating with people outside of the prison." *Id.*   ¶ 172.   Defendants have done so, plaintiffs assert, by denying them "access to tele-communication devices that would give them the ability and opportunity to communicate with

- 10 -

people outside of prison." *Id.*

As noted, plaintiffs seek to recover monetary damages.  Courts (including several federal appellate courts, as well as district courts in the Fourth Circuit) have held that compensatory damages may be awarded under Title II of the ADA or the Rehabilitation Act, if a public entity "intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons." *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008); *accord Adams v. Montgomery College (Rockville)*, 834 F. Supp. 2d 386, 393-95 (D. Md. 2011) (applying deliberate indifference standard); *Paulone*, *supra*, 787 F. Supp. 2d at 373-74 (collecting cases endorsing deliberate indifference standard).

Additional facts will be presented in the Discussion.

## Discussion

The Correctional Defendants and the DLLR Defendants challenge plaintiffs' Complaint on separate grounds.  The Correctional Defendants argue that plaintiffs' claims are barred because plaintiffs failed to exhaust administrative remedies before filing suit, as is required of prisoners by 42 U.S.C. § 1997e(a), a provision of the Prison Litigation Reform Act of 1996 ("PLRA").  The DLLR Defendants are defendants by virtue of plaintiffs' contention that plaintiffs have been denied reasonable accommodations with respect to prison educational and vocational programs conducted by the DWDAL (a division of DLLR).  According to the DLLR Defendants, they are not liable for plaintiffs' claims because plaintiffs have no legal entitlement to participation in educational or vocational programs, and it is within DPSCS's sole discretion whether a prisoner may participate in the programs that the DWDAL offers.  As the DLLR Defendants see it, to the extent that plaintiffs complain about the unavailability or inaccessibility

of DWDAL programs, plaintiffs' complaint is with DPSCS, not the DLLR Defendants.  I will consider each motion in turn.

### A.  Correctional Motion

Neither Title II of the ADA nor § 504 of the Rehabilitation Act contains a requirement of exhaustion of administrative remedies by private litigants.  Moreover, 42 U.S.C. § 1983 is the vehicle for plaintiffs' First Amendment claims, and the "general rule" is that "plaintiffs proceeding under § 1983 need not exhaust state administrative remedies before filing suit." *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 676 (4th Cir. 2005) (citing *Porter v. Nussle*, 534 U.S. 516, 523 (2002), and *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982)); *see also Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 427-28 (1987) ("[T]he existence of a state administrative remedy does not ordinarily foreclose resort to § 1983."); *Earle v. Gunnell*, 78 Md. App. 648, 653-59, 554 A.2d 1256, 1258-61 (1989) (holding that administrative exhaustion ordinarily is not a necessary predicate to suit under § 1983 in either federal court or Maryland state court).  However, suits filed by prisoners come within a legislatively created exception to the general rule.  In the PLRA, Congress established a prerequisite of administrative exhaustion for any federal claims brought by prisoners.  *See Anderson*, 407 F.3d at 676-77.

The PLRA's exhaustion requirement states: "No action shall be brought with respect to prison conditions under [42 U.S.C.] section 1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted

of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). Invoking the requirement of § 1997e(a), the Correctional Defendants contend that plaintiffs' claims have not fully been exhausted through the available administrative remedies.

DPSCS has made an administrative remedy procedure "available" to Maryland state prisoners, within the meaning of 42 U.S.C. § 1997e(a), for the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." Md. Code (2008 Repl. Vol., 2011 Supp.), § 10-206(a) of the Correctional Services Article ("C.S."); *see generally* C.S. §§ 10-201 *et seq.* Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance" to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement." Code of Maryland Regulations ("COMAR") 12.07.01.01.B(8).[11]

---

[11] Maryland state appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC [Division of Correction] inmate.'" *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted). Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Id.* at 651, 898 A.2d at 960 (citation omitted). Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC. *See Adamson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000). Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," C.S. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

The parties have not raised the question of whether the claims asserted by plaintiffs concern their "conditions of confinement," so as to come within the definition of a "grievance"

In the Maryland correctional system, if the particular institution in which an inmate is incarcerated provides an internal administrative remedy procedure ("ARP"), the inmate must complete the ARP process as a condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D.   Thereafter, within 30 days after the completion of the ARP process, the inmate may request further review by submission of a complaint to the statewide Inmate Grievance Office ("IGO").  *See* COMAR 12.07.01.05.B; *see also* C.S. § 10-206.   Complaints are reviewed preliminarily by the IGO.   *See* C.S. § 10-207; COMAR 12.07.01.06.   And, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge for the Maryland Office of Administrative Hearings. *See* C.J. § 10-208; COMAR 12.07.01.07-.08.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination.   However, a decision concluding that the inmate's complaint is wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge.   *See* C.S. § 10-209(b)-(c).   In either event, the final agency determination is subject to judicial review in Maryland state court.   *See* C.S. § 10-210.   But, an inmate need not seek judicial review in state court in order to satisfy the PLRA's administrative exhaustion requirement.   *See, e.g.*, *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir.) ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court."), *cert. denied*, 537 U.S. 949 (2002).

---

and be subject to Maryland's administrative remedy procedure for state prisoners.  Accordingly, I assume, without deciding, that the claims are subject to the requirement of administrative exhaustion.

*1.  Standard of Review*

As a preliminary matter, the Correctional Defendants have raised their contention by way of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b).  Rule 12(b) authorizes the presentation of seven enumerated defenses by motion, before the filing of a responsive pleading.  The Correctional Defendants have not specified a particular subsection of Rule 12(b) on which they rely, but the only ones that could arguably apply are Rule 12(b)(1), pertaining to lack of subject matter jurisdiction, and Rule 12(b)(6), for failure to state a claim upon which relief can be granted.  In my view, neither Rule 12(b)(1) nor Rule 12(b)(6) is an appropriate vehicle for the Correctional Defendants' argument.  Rather, as I will explain, I must resolve the motion under a summary judgment standard, pursuant to Rule 56.

Rule 12(b)(1) is not applicable here.  Although exhaustion of administrative remedies is an important and mandatory prerequisite to certain suits, "[e]very court to have considered the question has concluded that § 1997e(a)'s exhaustion requirement is not a jurisdictional requirement," and the Fourth Circuit "agree[s]."  *Anderson*, 407 F.3d at 677.  *Cf. Henderson ex rel. Henderson v. Shinseki*, ___ U.S. ___, 131 S. Ct. 1197, 1202 (2011) ("[A] rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity . . . .  Other rules, even if important and mandatory . . . should not be given the jurisdictional brand.  Among the types of rules that should not be described as jurisdictional are . . . 'claim-processing rules[,]' [which] seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times.") (internal citations omitted).

Moreover, in *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court made clear that a prisoner's compliance with the PLRA's administrative exhaustion requirement ordinarily cannot

be resolved by way of a Rule 12(b)(6) motion.  This is because "failure to exhaust is an affirmative defense under the PLRA, and . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints."  *Id.* at 216.  The Supreme Court's ruling in *Jones* was in accord with the "settled general rule" that "the burden of proving an affirmative defense is on the party asserting it."  *McNeill v. Polk*, 476 F.3d 206, 220 n.3 (4th Cir.), *cert. denied*, 552 U.S. 1043 (2007).  A Rule 12(b)(6) motion tests the adequacy of a plaintiff's pleading, and typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint.  As such, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein, on a motion to dismiss" under Rule 12(b)(6), *Clatterbuck v. City of Charlottesville*, ___ F.3d ___, No. 12-1149, slip op. at 13, 2013 WL 632950 (4th Cir. Feb. 21, 2013), except for documents that are "integral to the complaint and authentic."  *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

Consistent with these principles, the *Jones* Court stated that a prisoner suit conceivably could be dismissed under Rule 12(b)(6) for failure to exhaust administrative remedies if the "allegations in the complaint suffice to establish that ground."  *Jones*, 549 U.S. at 215.  But, that will be the rare case, because "the burden of pleading exhaustion in a case covered by the PLRA" is not placed "on the prisoner."  *Id.* at 211; *accord Anderson*, 407 F.3d at 682 ("While it seems unlikely that the failure to exhaust administrative remedies will often be apparent from the face of a complaint, it is certainly possible that a complaint may clearly show that an inmate has

not exhausted his administrative remedies.").

Here, the Correctional Defendants do not suggest that the allegations in the Complaint establish that plaintiffs have failed to exhaust their administrative remedies. To the contrary, the Correctional Defendants rely on exhibits to their motion, consisting of copious documentation from authenticated records of DPSCS related to administrative grievances filed by plaintiffs. Rule 12(d) requires that, in connection with a Rule 12(b)(6) motion, a court may only consider "matters outside the pleadings" if the court "treat[s] [the motion] as one for summary judgment under Rule 56." Rule 12(d) also provides: "All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."[12]

However, plaintiffs have not objected to the Court's consideration of the extrinsic documentation submitted by the Correctional Defendants, nor have they submitted additional documentation to controvert it. Plaintiffs also have not sought the opportunity for discovery, pursuant to Rule 56(d), before responding to the Correctional Motion. Rather, plaintiffs meet the Correctional Defendants' argument head-on and argue that the Correctional Defendants' evidence, as a matter of law, does not warrant dismissal for failure to exhaust administrative remedies. Accordingly, I will consider the Correctional Motion as a motion for summary judgment, under the Rule 56 standard.[13]

---

[12] Rule 12(d) is discussed in more detail, *infra*, with respect to the DLLR Motion.

[13] Plaintiffs cite some cases from outside the Fourth Circuit for the proposition that administrative exhaustion should be addressed by "unenumerated Rule 12(b) motions to dismiss." Correctional Opposition at 7 (citing *Bryant v. Rich*, 530 F.3d 1368 (11th Cir.), *cert. denied*, 555 U.S. 1074 (2008), and *Wyatt v. Terhune*, 315 F.3d 1108, 1119-20 (9th Cir.), *cert. denied sub nom. Alameida v. Wyatt*, 540 U.S. 810 (2003)). The reasoning of the cited cases is that administrative exhaustion, although "non-jurisdictional, . . . is like a defense for lack of jurisdiction in one important sense: Exhaustion of administrative remedies is a 'matter[ ] in abatement, and ordinarily [does] not deal with the merits.'" *Bryant*, 530 F.3d at 1374 (citation

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Here, the governing law at issue concerns the scope of the legal requirement to exhaust administrative remedies under the PLRA. The material facts are drawn from the DPSCS records submitted by the Correctional Defendants. Plaintiffs do not challenge the accuracy or completeness of the DPSCS records, and so there is no dispute of material fact. The question is whether, on the basis of the documents presented, the Correctional Defendants are "entitled to judgment as a matter of law" on the issue of administrative exhaustion. Fed. R. Civ. P. 56(a).

### 2. Exhausted and Unexhausted Claims

The Supreme Court articulated another holding in *Jones*, *supra*, 549 U.S. 199, that is salient here. The Court held that, when a "prisoner has failed to exhaust some, but not all, of the

---

and footnote omitted) (alteration in *Bryant*). Therefore, the cases reason, failure to exhaust should be "subject to an unenumerated Rule 12(b) motion rather than a motion for summary judgment," because "'[s]ummary judgment is on the merits,' whereas 'dismissal of an action on the ground of failure to exhaust administrative remedies is not on the merits.'" *Wyatt*, 315 F.3d at 1119 (internal citation omitted). Moreover, both cases conclude that the judge may decide disputed issues of fact in considering a motion to dismiss for non-exhaustion and that, if the court finds that the defendant has carried its burden to prove non-exhaustion, "the proper remedy is dismissal of the claim without prejudice." *Id.* at 1120; *accord Bryant*, 530 F.3d at 1375-76.

*Bryant* and *Wyatt* are persuasive, although it does not appear that either the Fourth Circuit or the Supreme Court has addressed this issue. However, I need not consider whether to adopt the logic of *Bryant* and *Wyatt* here and depart from the ordinary rule that consideration of matter outside the pleadings requires application of a summary judgment standard. In this case, there is no dispute of fact for potential resolution by a fact-finder and, given that I will deny the Correctional Motions, the issue of whether judgment should be entered with or without prejudice does not arise. Therefore, in this case, the Rule 56 standard and the "unenumerated Rule 12(b)" standard articulated in *Bryant* and *Wyatt* reach the same result.

claims asserted in the complaint," the court should dispose of the unexhausted claims, but should "proceed with the exhausted claims"; it should not "dismiss the entire action if any one claim is not properly exhausted." *Id.* at 219-20. In other words, administrative exhaustion under the PLRA is not an all-or-nothing proposition.

Over the course of the briefing of the Correctional Motion, the Correctional Defendants have made clear that their motion is, in fact, only a motion for partial dismissal. The Correctional Defendants concede that two of the plaintiffs, Mr. Jarboe and Mr. Redd, have properly exhausted administrative remedies with respect to certain grievances. Mr. Jarboe fully exhausted an administrative grievance proceeding denominated IGO #20111307; Mr. Redd exhausted proceeding IGO #20110140. *See* Correctional Reply at 1-2. The Correctional Defendants' also "accept Plaintiffs' argument" that an uncompleted administrative grievance proceeding initiated by a third plaintiff, Mr. Davis, denominated as IGO #20090995, "represented a sort of 'reminder' of [an] earlier meritorious appeal to the Commissioner of Correction," and thus should not be considered a failure to exhaust. Correctional Reply at 1-2.

Therefore, the Correctional Defendants concede that Jarboe, Redd, and Davis each have exhausted their administrative remedies with respect to the matters that each one raised in his grievance proceeding. Accordingly, the Correctional Defendants agree, pursuant to *Jones*, that the claims of Jarboe, Redd, and Davis are not subject to dismissal to the extent that each one raised his claims in his administrative grievance proceeding. Nevertheless, no single plaintiff administratively exhausted all of the claims that are alleged here.

Plaintiffs contend, and the Correctional Defendants do not appear to dispute, that between them, Mr. Jarboe, Mr. Redd, and Mr. Davis raised in their administrative grievance proceedings

*all* of the claims against the Correctional Defendants that are at issue in this case. In particular, plaintiffs allege that the Correctional Defendants have failed to provide access to appropriate auxiliary aids and services to enable plaintiffs to participate in and benefit from DPSCS's programs, and have failed to provide deaf and hard-of-hearing inmates with adequate access to the system for audio alerts and notifications used in DPSCS facilities. These allegations, they contend, were exhausted by Mr. Redd and Mr. Davis. In addition, plaintiffs claim that the Correctional Defendants have discriminated against them on the basis of disability, and infringed upon their First Amendment rights by failing to provide adequate access to telecommunications devices for communication with people outside of prison. They assert that these claims were exhausted by Mr. Jarboe.

According to a Declaration of Scott S. Oakley, the Executive Director of the IGO, submitted by the Correctional Defendants, Mr. Redd filed a grievance with the IGO on January 20, 2011, complaining that "MCIJ staff were not accommodating his hearing impairment so that he could participate in programs and have equal access to jobs and services." Oakley Decl. at 4, Ex.B to Correctional Motion (ECF 29-3). This grievance arose out of an ARP request in which Mr. Redd complained of a failure of MCI-J to "make available appropriate auxiliary aids and services where necessary to ensure effective communication." Ex.A to Correctional Motion at 146 (Redd ARP Request #MCIJ-0607-10). Among his particular complaints, Mr. Redd asserted: "When I am called for Chow, Kitchen detail, Medical Pass, Visits, etc. the pod officers has [sic] no knowledge how to inform me and I'm late for everything . . . ." *Id.* According to Mr. Oakley, Mr. Redd's grievance was "administratively dismissed" by the IGO on March 15, 2011, "for

failure to state a claim upon which administrative relief could and should be granted."  Oakley

Decl. at 4.

Mr. Davis filed an ARP request to the Warden of MCI-J in October 2010, in which he

stated, in relevant part:

> I am a hearing impaired inmate. . . .  I have been trying to take different programs
> that's [sic] been offered to hearing inmates, but I'm not able to fully participate in
> class . . . .  I'm still lacking the auxiliary hearing aids and services where
> necessary to ensure effective communication. . . .  I can not even hear when I'm
> called for my legal mail or any other announcements.

Ex.A to Correctional Motion at 94-95 (Davis ARP Request #MCIJ-0633-10).

On or about November 22, 2010, in response to Mr. Davis's request, the Warden ruled,

*id.* at 94 (emphasis in original):

> **Your request for administrative remedy has been investigated and was found
> meritorious.**  An investigation revealed that the facility is not equipped with an
> assistive listening device to assist with communication for the Hearing Impaired
> to participate in programs.  However, the facility is taking the necessary steps to
> inquire about a device that can be provided to you for assistance.

According to plaintiffs, notwithstanding the Warden's ruling, no remedy for Mr. Davis's

complaint was ever implemented.  *See* Correctional Opposition at 12-13.  In June 2011, after Mr.

Davis had waited nearly eight months for the prison to implement the remedy, he filed a second

ARP request, reiterating his complaint in light of the lack of follow-through.  *See* Ex.A to

Correctional Motion at 87-88 (Davis ARP Request #MCIJ-0377-11).

Mr. Jarboe filed a grievance on June 21, 2011, complaining that he "could not contact his

friends and family because he did not have access to a video relay or video phones."  Oakley

Decl. at 1.  The IGO dismissed the grievance on August 18, 2011, on the basis that it failed "to

state a claim upon which administrative relief could and should be granted," *id.* at 2, and for the

additional reason that "Jarboe had access to TTY devices and Maryland relay services," *id.*, which the IGO apparently viewed as adequate accommodations for Mr. Jarboe's disability, in lieu of video relay or video phones.

As indicated, no single plaintiff administratively exhausted all of the claims that are at issue here. And, plaintiffs do not dispute that two of the plaintiffs, Mr. Connelly and Mr. Denmark, have not exhausted administrative remedies at all.[14] The Correctional Defendants maintain that the claims of those two plaintiffs should be dismissed in their entirety. And, they insist that the claims of Mr. Jarboe, Mr. Redd, and Mr. Davis should be dismissed to the extent that each one did not assert a given claim in his particular administrative grievance proceeding.

In contrast, plaintiffs contend that they are entitled to proceed because each claim they advance in this lawsuit was administratively exhausted in one or more of the grievance claims of Mr. Jarboe, Mr. Redd, and Mr. Davis. Plaintiffs invoke the doctrine of "vicarious exhaustion," sometimes called the "single-filing rule," to argue that exhaustion of a claim by one plaintiff is sufficient to exhaust it for all. This doctrine, originally developed in the context of the administrative exhaustion requirement under Title VII of the Civil Rights Act of 1964 and related employment discrimination statutes, permits employees who allege that they have all been subjected to the same discriminatory employment practice to rely, in a class action or other multi-plaintiff suit, on a single employee's filing of a complaint with the EEOC challenging the disputed practice to satisfy the requirement of administrative exhaustion.

---

[14] According to the DSPCS records submitted by the Correctional Defendants, Mr. Connelly has never filed a grievance with the IGO. *See* Correctional Motion at 6. Mr. Denmark filed a grievance with the IGO in July 2011, alleging that he was "fired" from a prison job because he complained "about his rights as a deaf inmate." *Id.* at 7. However, his grievance was dismissed when he failed to respond to a letter from the IGO requesting further information. *Id.*

The doctrine of vicarious exhaustion has been applied by several courts, including this district, to employment discrimination claims.   The Fourth Circuit has also recognized the concept of vicarious exhaustion in the context of class actions under Title VII.   *See Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 490 n.11 (4th Cir. 1981).   And, it has been applied by other courts with respect to the exhaustion requirement of the PLRA, and has been extended by some courts beyond the class action context.

Therefore, resolution of the Correctional Motion turns on whether plaintiffs are entitled to rely on vicarious exhaustion, such that exhaustion of each claim by at least one of the plaintiffs satisfies the PLRA's administrative exhaustion requirement for all of the plaintiffs.

### 3. Vicarious Exhaustion / Single-Filing Rule

The Eleventh Circuit is the only federal circuit court of appeals that has devoted substantial analysis to the vicarious exhaustion doctrine in the context of prisoner litigation.   It adopted the doctrine in *Chandler v. Crosby*, 379 F.3d 1278 (11th Cir. 2004); *see also Gates v. Cook*, 376 F.3d 323, 329-320 (5th Cir. 2004) (applying vicarious exhaustion in PLRA context without substantial analysis).

In *Chandler*, death-row inmates in Florida state prisons brought a class-action suit, alleging that uncontrolled high temperatures in their cells during the summer months amounted to cruel and unusual punishment under the Eighth Amendment.   *Id.* at 1282.   The district court granted the plaintiffs' unopposed motion to certify the class, without considering whether the plaintiffs had exhausted their administrative remedies pursuant to the PLRA.   *Id.* at 1283.   But, following a bench trial, the district court held that the inmates had not suffered an Eighth Amendment violation.   *Id.*   On appeal, the Eleventh Circuit raised the issue of administrative

exhaustion *sua sponte*, apparently out of concern that the issue might be jurisdictional (a question that the Supreme Court had not yet resolved). *See id.* at 1286 & nn.16-17.

Relying on appellate case law articulating the vicarious exhaustion or single-filing rule under Title VII and on district court decisions extending the doctrine to the PLRA context, the *Chandler* Court held that vicarious exhaustion applied. *See id.* at 1286-88. Accordingly, it ruled that the requirement of administrative exhaustion did not bar the inmates' suit because one of the inmates had exhausted administrative remedies with respect to the issue of excessive heat. *Id.* In particular, the court determined that "a class of prisoner-plaintiffs certified under Rule 23(b)(2)[15] satisfies the PLRA's exhaustion requirement through 'vicarious exhaustion,' i.e., when 'one or more class members ha[s] exhausted his administrative remedies with respect to

---

[15] Fed. R. Civ. P. 23(b) enumerates three alternative bases for certification of a class action:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. . . .

Regardless of which basis for class certification applies under Rule 23(b), every class action must also satisfy Rule 23(a)'s requirements of numerosity of the class members, commonality of claims, and typicality and adequacy of the representative plaintiffs.

each claim raised by the class.'"  *Id.* at 1287 (quoting *Jones'El v. Berge*, 172 F. Supp. 2d 1128, 1133 (W.D. Wis. 2001)).

The Eighth Circuit advanced "two reasons" for its decision, *id.* (internal citations omitted):

> First, this rule advances the purpose of administrative exhaustion, which, we have stated (albeit in the employment context), "is to put the [administrative authority] on notice of all issues in contention and to allow the [authority] an opportunity to investigate those issues."  Once the "prison officials have received a single complaint addressing each claim in a class action, they have the opportunity to resolve disputes internally and to limit judicial intervention in the management of prisons."  Second, a different rule, e.g., one requiring all class members to exhaust their administrative remedies, "could impose an intolerable burden upon the inmate complaint review system."  This is true both for the inmates and the prison officials.  In this case, the Florida Department of Corrections would have been taxed with the duty to respond to complaints from over three hundred death row inmates.  Moreover, in cases like this one, where the composition of the class is subject to constant change beyond the class members' control, it could be extraordinarily difficult for all class members to exhaust administrative remedies before filing suit.

Although *Chandler* is the only reported federal appellate decision considering vicarious exhaustion in the prison litigation context, many circuits have applied essentially the same doctrine in the Title VII context for decades, under the rubric of "vicarious exhaustion" or the "single-filing rule."  In one early case, the Fifth Circuit articulated the pragmatic basis for the rule: "It would be wasteful, if not vain, for numerous employees, all with the same grievance, to have to process many identical complaints with EEOC.  If it is impossible to reach a settlement with one discriminatee, what reason would there be to assume that the next one would be successful[?]"  *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 498 (5th Cir. 1968).

The Fourth Circuit "has long applied th[e] 'single-filing rule' to class actions" involving employment discrimination claims, *King v. McMillan*, 233 F. App'x 242, 244 (4th Cir.)  (citing

*Chisholm*, *supra*, 665 F.2d at 490 n.11), *cert. denied*, 552 U.S. 991 (2007), although it "has not yet . . . adopted" the rule outside the class action context. *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 293 (4th Cir. 2004). In an unreported decision in this district, *Barkhorn v. Ports America Chesapeake, LLC*, Civ. No. JKB-10-750, 2011 WL 4479694 (D. Md. Sept. 26, 2011), Judge James K. Bredar recently applied the single-filing rule in a multi-plaintiff employment discrimination suit that was not a class action. He articulated two predicates for application of the doctrine: first, that "'all plaintiffs' claims are substantially similar,'" which is necessarily true in any case that has been certified as a class action, but may also be true in a non-class action; and second, that "'the EEOC charge itself gave notice of the charge's collective nature.'" *Id.* at *4 (citation omitted). Both predicates are met here. All of the plaintiffs are profoundly deaf and assert claims based on defendants' alleged failure to provide reasonable accommodations for their shared disability.

In response to plaintiffs' invocation of vicarious exhaustion, the Correctional Defendants posit that this case is distinguishable from *Chandler* and other cases endorsing vicarious exhaustion because this case has not yet been certified as a class action. Moreover, the Correctional Defendants argue that class certification should not be granted here because the size of the proposed class is insufficiently numerous to warrant class treatment, *see* Fed. R. Civ. P. 23(a)(1), given that there are only about a dozen deaf inmates in the Maryland prison system, and the individual plaintiffs "vary widely in the degree of their hearing impairment and the nature of their complaints." Correctional Reply at 2.

To be sure, *Chandler* applied the concept of vicarious exhaustion where a class had been certified. But, the district court in that case had not considered the exhaustion requirement

before certifying the class.  It would make little sense for the application of vicarious exhaustion to turn on whether a defendant chose to interpose the affirmative defense of administrative exhaustion before or after the plaintiffs moved to certify a class.

The Correctional Defendants' challenge to the suitability of this case for class treatment is premature, because no motion for class certification is pending before the Court.  Moreover, the Correctional Defendants improperly asserted their challenge to class certification for the first time in their reply brief.  *See Marshall v. James B. Nutter & Co.*, 816 F. Supp. 2d 259, 264 (D. Md. 2011) ("This Court has previously held that '[t]he ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.'") (quoting *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 735 (D. Md. 2006)).

In any event, whether a class is ultimately certified is not necessarily dispositive of the vicarious exhaustion issue.  Although the Fourth Circuit has not expressly adopted the first-filing rule outside the class action context, it has not affirmatively rejected it.  Indeed, almost every federal appellate court that has decided the issue has applied the single-filing rule beyond the class-action context.  *See King*, 233 F. App'x at 244 (citing cases and noting Third Circuit as only circuit adopting minority view).  In *Foster v. Geory*, 655 F.2d 1319, 1322 (D.C. Cir. 1981), the D.C. Circuit explained that, "[i]n class actions, [the single-filing rule] is invariably applicable, for the very fact that the suit is a class action means that the plaintiffs' claims not only share common questions of law and fact, but those claims are such that representative plaintiffs will fairly and adequately protect the interests of all plaintiffs of the class."  However, the rule "has been extended to situations where no class action has been certified, but where the

court was nonetheless able to treat as a class a plaintiff who had [exhausted administrative remedies] and one or more plaintiffs who had not satisfied that requirement." *Id.*

In *Barkhorn*, Judge Bredar adopted the single-filing rule in a non-class suit involving multiple plaintiffs, observing that the fact that paintiffs might "be entitled to different amounts of damages" was "not material to whether their claims are substantially similar in nature." 2011 WL 4479694, at *4. So too here: although the extent of plaintiffs' disabilities and requested accommodations may vary to some degree, all of the plaintiffs are profoundly deaf and complain about substantially similar alleged failures to accommodate their disability in common aspects of prison life. In my view, application of the single-filing rule is appropriate in such circumstances, even if class certification is not obtained or is never sought.[16]

Indeed, the outcome of the administrative grievance process for the plaintiffs who did exhaust their administrative remedies provides another indication that this case is an appropriate candidate for vicarious exhaustion. The grievance claims of Mr. Jarboe and Mr. Redd were both dismissed on the basis that they failed to state claims on which relief could be granted by way of

---

[16] To be sure, there is case law that has held vicarious exhaustion inapplicable after class certification has been considered and denied. Depending on the reason for denial of class certification, a court's decision not to certify a class may well undermine the ground for application of vicarious exhaustion. For instance, where certification of a class is inappropriate because the representative plaintiffs do not meet the commonality and typicality requirements of Fed. R. Civ. P. 23(a), *see, e.g.*, *Heng v. Donald*, Civ. No. 7:08-CV-5, 2010 WL 497347, at *4 (M.D. Ga. Feb. 4, 2010) (denying class certification), it tends to follow logically that the plaintiffs' claims are insufficiently similar to justify application of vicarious exhaustion. *See, e.g.*, *Heng v. Donald*, Civ. No. 7:08-CV-5, 2011 WL 925726, at *5 (M.D. Ga. Jan. 25, 2011) (holding vicarious exhaustion inapplicable in light of denial of class certification). On the other hand, there is no logical reason that a lack of sufficient numerosity to justify class treatment should preclude application of vicarious exhaustion. Depending on the ultimate decision in this case regarding class certification, and the basis for that decision, defendants may seek to revisit the issue of exhaustion. But, in the current posture of the case, there is no basis to rule that vicarious exhaustion does not apply.

the administrative grievance procedure.  In Mr. Davis's case, the warden found that his grievance was meritorious, but then allegedly failed to take further action to provide a timely remedy.[17] The strong impression given by the administrative record is that DPSCS's grievance procedure simply is not equipped to address programmatic complaints such as those advanced here by plaintiffs.  Thus, there is no reason to expect that Mr. Denmark, Mr. Connelly, or any of the members of the proposed class would experience any different result than Messrs. Jarboe, Redd, and Davis if they were required to administratively exhaust their claims.  Such a requirement would only result in the overburdening of the administrative process with unnecessarily duplicative claims of a nature that the process is demonstrably ill-suited to handle.  And, where a correctional institution has been given a full opportunity to address a prisoner complaint without judicial involvement, the purpose of the PLRA's exhaustion requirement has been fulfilled.

Accordingly, the Correctional Motion will be denied.

## B.  DLLR Motion

Plaintiffs' Complaint asserts all three of its counts against all defendants, and does not specifically delineate which allegations are directed at which defendants.  However, it appears that plaintiffs have sued the DLLR Defendants in connection with the allegation that, due to plaintiffs' disabilities, they "have been excluded from participation in educational and counseling programs offered by DPSCS and Correctional Education, including those required under the terms of their sentencing."  Complaint at 3.[18]  As noted, DLLR, through its division DWDAL,

---

[17] Notably, the Correctional Defendants have not controverted plaintiffs' claim that a remedy was not provided to Mr. Davis, and they bear the burden of proof as to the affirmative defense of administrative exhaustion.

[18] Plaintiffs' allegations against the DLLR Defendants do not seem to be encompassed within Count III of plaintiffs' Complaint, which alleges violations of the First Amendment on the

manages the Correctional Education program within the Maryland state prison system.[19]

The DLLR Defendants advance two arguments in their motion.  First, they contend that plaintiffs fail to state a claim because plaintiffs have no legal entitlement to participation in educational or vocational programs.  Second, the DLLR Defendants maintain that they are not liable for any violation of plaintiffs' rights under the ADA or Rehabilitation Act, because DPSCS controls the assignment of inmates to the educational programs.  Therefore, they insist that the DLLR Defendants are not liable for any violation of plaintiffs' ADA or Rehabilitation Act rights.

### 1.  Conversion to Summary Judgment

As noted, the DLLR Motion is styled as a Rule 12(b)(6) motion to dismiss or, in the alternative, as a motion for summary judgment under Rule 56.  In support of their Motion, the DLLR Defendants have submitted affidavits of Assistant Secretary Francois and Alice Wirth, the Director of Correctional Education for DLLR.  *See* Francois Aff., Ex.1 to DLLR Motion (ECF 25-2); Wirth Aff., Ex.2 to DLLR Motion (ECF 25-3).[20]

A motion presented in this manner "implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure."  *Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012).  As discussed,

---

basis of plaintiffs' alleged deprivation of appropriate accommodations to enable them to communicate with others who are outside of prison.  Rather, the claims against the DLLR Defendants appear to arise solely from the ADA (Count I) and the Rehabilitation Act (Count II).

[19] The parties agree that the Correctional Education program formerly was within the purview of the Maryland State Department of Education.  Responsibility for the program was transferred to DLLR effective July 1, 2009.

[20] The affidavits are just over one page in length, and their content is exactly the same, aside from their first paragraphs, which contain background information regarding each affiant.

*supra*, Rule 12(d) permits a court, in its discretion, to consider matters outside of the pleadings in connection with a motion filed under Rule 12(b)(6), and thereby convert the motion to one for summary judgment.[21]

Under Rule 12(d), a district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, . . . or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2012 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67. "When the extra-pleading material is comprehensive and will enable a rational determination of a summary judgment motion in accordance with the standard set forth in Rule 56, the district court is likely to accept it." *Id.* at 165. In contrast, when the extraneous material is "scanty, incomplete, or inconclusive, the district court probably will reject it." *Id.* at 165-66.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). However, a "party opposing summary judgment 'cannot complain

---

[21] If the court intends to exercise its discretion under Rule 12(d) to convert a motion to dismiss to one for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20 (D. Md. Feb. 14, 2011)).  "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).  A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

In response to the DLLR Motion, plaintiffs have submitted an affidavit of their counsel Joseph D. Edmondson, Jr., pursuant to Rule 56(d), *see* ECF 30-1, arguing that summary

judgment on the grounds advanced by the DLLR Defendants would be premature in advance of discovery.  As I will explain, I agree.  Moreover, even if the Court considers the affidavits submitted with the DLLR Motion, the DLLR Defendants have not established their entitlement to summary judgment.  Thus, the DLLR Motion fails, regardless of whether it is considered under a Rule 12(b)(6) or Rule 56 standard.

### 2.  Entitlement to Services

The DLLR Defendants' lead argument is a purely legal claim that does not depend on their affidavits for support.  They contend that plaintiffs' "mere allegations that [the DLLR] Defendants did not supply services cannot rise to the level of discrimination," because plaintiffs "are not constitutionally entitled to participation in an educational or vocational program." DLLR Motion at 4-5.  Plaintiffs respond that the DLLR Defendants have missed the point: "The issue here is not whether the Plaintiffs are entitled to participate in these programs, but rather, whether they have been discriminatorily prohibited from participation in these programs due to their disabilities in violation of the ADA and the Rehabilitation Act."  DLLR Opposition at 15.

By their plain text, the ADA and the Rehabilitation Act require that a qualified individual with a disability may not be "excluded from participation in or be denied the benefits of the services, programs, or activities of" an entity subject to the statutes, "or be subjected to discrimination by any such entity."  42 U.S.C. § 12132 (provision of ADA applicable to "public entit[ies]"); *see also* 29 U.S.C. § 794(a) (provision of Rehabilitation Act, stating: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .").

There is no textual limitation requiring that a plaintiff must demonstrate some other source of legal entitlement to participation in the program or activity at issue in order to proceed under either statute.  Rather, it is enough that the plaintiff is excluded from participation in or denied the benefits of the program on the basis of disability.

The Fourth Circuit's recent decision in *Seremeth*, *supra*, 673 F.3d 333, aptly demonstrates this principle.  In that case, the Court considered whether the requirements of Title II of the ADA and § 504 of the Rehabilitation Act "apply to police investigations and detentions," such that a deaf police detainee would be entitled to reasonable accommodations to allow him to communicate effectively with the officers detaining him.  *Id.* at 336.  The Court answered in the affirmative, notwithstanding that the detainee could point to no other source of legal entitlement to communication (effective or otherwise) with the officers who detained him.  The *Seremeth* Court said: "While the Supreme Court in the *Miranda* context has said that the Constitution does not require 'that the police supply a suspect with a flow of information,' *Moran v. Burbine*, 475 U.S. 412, 422 (1986), *the ADA applied once the deputies attempted to question and obtain information from* [*the detainee*]."  *Seremeth*, 673 F.3d at 339 (emphasis added).[22]  Once a public entity or a recipient of federal financial assistance makes a "program" or "activity" available, within the meaning of the statutes, the ADA and the Rehabilitation Act prohibit discrimination on the basis of disability against an otherwise qualified individual with respect to that program or activity.

---

[22] The *Seremeth* Court concluded that, although the detainee was entitled to reasonable accommodations under the ADA and the Rehabilitation Act, the accommodations he demanded were not "reasonable" within the meaning of the statutes, under the factual circumstances.  *See Seremeth*, 673 F.3d at 339-41.

Thus, to the extent that the DLLR Defendants make programs, activities, or services available to inmates generally, the ADA requires that such programs, activities, or services be made available to otherwise-qualified inmates with disabilities without discrimination, and that reasonable accommodations be provided to disabled inmates to enable them to benefit from the programs, activities, or services. Regardless of the precise scope of the terms "program" and "activity" under the ADA, it is clear that those terms apply to educational programs in state prisons. *See Yeskey*, *supra*, 524 U.S. at 210 (stating that Title II of ADA applies to "educational and vocational 'programs'" provided to inmates by state prisons).[23] Thus, the DLLR Defendants' first argument lacks merit.

### 3. Proper Defendant

The DLLR Defendants' second argument relies, in part, upon the affidavits of Assistant Secretary Francois and Director Wirth. Those officials aver, *inter alia*, that "DLLR cannot assign an inmate to a correctional education program." Francois Aff. at 1; Wirth Aff. at 1. They also assert: "While it is Correctional Education's responsibility to develop curriculum and provide instruction, assignment of inmates to the instructional . . . program resides with DPSCS," and "DPSCS Case management is responsible for assigning inmates to Correctional Educational or Vocational programs." *Id.* Moreover, they state that it is "DLLR's policy that if a deaf or hearing-impaired inmate is assigned to the correctional education program, DLLR works in conjunction with DPSCS to provide reasonable accommodation to allow the inmate to benefit

---

[23] Indeed, the *Seremeth* Court observed that at least three other circuit courts of appeal and the Department of Justice by regulation have concluded that Title II of the ADA "'applies to anything a public entity does,'" although the Fourth Circuit has not yet found it necessary to determine whether the definitions of "program" and "activity" under the ADA extend that far. *Seremeth*, 673 F.3d at 338 (citation omitted).

from the educational program." Both officials insist that they are unaware, during their tenure, of "any request by DPSCS for DLLR to provide any accommodations to deaf or hearing-impaired inmates to allow participation in the correctional education program," or of any occasion on which DLLR has "denied [sign-language] interpreter services to an inmate for educational classes." Francois Aff. at 1-2; Wirth Aff. at 1-2.

On the strength of these assertions, the DLLR Defendants contend that they "do not make [educational] services available to the general inmate population[;] they can only provide services to the individuals assigned by DSPCS." DLLR Motion at 9. Therefore, as they see it, there "was no benefit or service that could even be offered by [the DLLR] Defendants if DPSCS did not place the Plaintiffs into the correctional education program." *Id.* at 8. In sum, they claim that "DPSCS . . . provides access to correctional education programs, not DLLR." *Id.* at 5.

Plaintiffs respond that summary judgment is premature because they lack discovery as to the underlying policies and allocation of responsibility between DPSCS and DLLR for educational programming for inmates. Moreover, they point out that they allege, in the Complaint, that Mr. Davis "must attend an Anger Management program and drug/narcotic abuse program in order to be eligible for parole, but is unable to effectively participate in or understand these programs without the provision" of a "Computer Assisted Real Time (CART)" system that provides speech-to-text conversion. Complaint ¶ 96; *see also id.* ¶ 87. They also state: "Deaf and hard of hearing inmates at WCI have . . . been denied educational opportunities, such as classes to achieve a General Educational Development (GED) degree, due to the lack of any system of providing them with effective communication," and have been "denied interpreter services for classes such as Adult Basic Education," a course provided by DLLR. *Id.* ¶¶ 85, 97.

- 36 -

Ultimately, the DLLR Defendants' position may prove to be correct.   To the extent that DPSCS maintains exclusive control over the assignment of inmates to Correctional Education programs and has never assigned deaf inmates to such programs, it is hard to see how the DLLR Defendants would be liable.  But, if DPSCS has assigned deaf inmates to Correctional Education programs, it is by no means clear that it would be DPSCS's responsibility, rather than DLLR's, to provide whatever reasonable accommodations that were necessary for those inmates.  Indeed, the affidavits of Francois and Wirth indicate that such responsibility is shared between both DPSCS and DLLR.

In addition, the DLLR Defendants might arguably be able to demonstrate that they are not liable under the Rehabilitation Act or the ADA if they never received any requests for reasonable accommodations for inmates, because "'the ADA's reasonable accommodation requirement *usually* does not apply unless triggered by a request.'"   *Kiman v. New Hampshire Department of Corrections*, 451 F.3d 274, 283 (1st Cir. 2006) (emphasis added) (citation omitted).   However, the affidavits of Assistant Secretary Francois and Director Wirth do not establish that the DLLR Defendants never received such a request; the affiants made their statements only to the best of the their information and belief, rather than on personal knowledge or upon review of DLLR's business records.  Moreover, "sometimes [a] [person]'s need for an accommodation will be obvious," and in those circumstances an explicit request for an accommodation is not required in order to establish the obligation to provide reasonable accommodations.  *Kiman*, 451 F.3d at 283; *accord Paulone*, *supra*, 787 F. Supp. 2d at 403-04 (collecting cases).

The affidavits presented by the DLLR Defendants are hardly comprehensive.  In my view, it would be premature to make a determination as to the DLLR Defendants' liability on the basis of the current state of the record.  A full factual record, developed through discovery, will benefit the Court in resolving which entity or entities are responsible for the provision of reasonable accommodations to inmates with disabilities who take part in Correctional Education programs.  Accordingly, I will deny the DLLR Motion, without prejudice to the DLLR Defendants' right to reassert their arguments concerning the allocation of programmatic responsibility in another motion for summary judgment filed after at least some discovery has occurred.

### Conclusion

For the reasons discussed, I will deny both the Correctional Motion and the DLLR Motion.  An Order implementing my rulings follows.


Date:  March 13, 2013                              _____/s/_____
                                                  Ellen Lipton Hollander
                                                  United States District Judge